THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WALTER REED BROWN, Defendant-Appellant.

Second District    No. 80-106

Opinion filed September 10, 1981.

58

Mary Robinson and Marilyn Martin, both of State Appellate Defender's Office, of Elgin, for appellant.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Phyllis J. Perko and Paula R. Johnson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

The defendant, Walter Reed Brown, was convicted of armed robbery following a jury trial and sentenced to a term of 10 to 30 years' imprisonment. He appeals, contending that the trial court erred in denying his motion to suppress evidence, that his in-court identification was the result of impermissibly suggestive pretrial procedures, and that numerous errors in ruling on evidence together with improper argument of the prosecutor combined to deny him a fair trial.

On the morning of July 22, 1977, an individual carrying a bowling bag was observed in the game room of the Stardust Bowl in Addison, Illinois, and a white-over-blue automobile was observed in the parking lot. At approximately 9 a.m. this individual forced his way into the bowling alley's rear office and ordered three employees, Frances Felz, Judy Busse and Patricia Nudo, against the wall. The gunman fired a shot, which embedded itself harmlessly in a wall, and took between $11,000 and $13,000 from the safe. At least part of this money had been bundled into groups and packed in bank bags. The gunman then ordered the women to lie down on the floor and left. The police were subsequently summoned, and various employees of the bowling alley who had seen the robber "contributed to a description" of the individual.

On January 16, 1978, Frances Felz observed the defendant in the bowling alley's game room and called the police, informing them that the

man who had committed the July 22 robbery had returned. The police arrived and arrested defendant, finding in his coat pocket a .38-caliber revolver which the parties stipulated at trial had not been used to fire the shot involved in the July 22 robbery. The police claimed that defendant was asked how he had gotten to the bowling alley and that he responded by pointing to a green Dodge Charger parked on the street near the main entrance. Defendant denied that he pointed out the car. Two officers remained with the car until it could be towed to the police station, at which point its contents were inventoried. The inventory produced two empty bowling bags and a blue bowling shirt. A search of defendant's Arizona residence disclosed a white-over-blue Dodge Charger with Illinois plates, two bank bags and a photo album.

Three of the Stardust Bowl's employees, Patricia Nudo, Judy Busse and Kay Cottone, were called to the Addison police station in January 1978. Mrs. Cottone was deceased at the time of trial. The three women were first shown a book of mug shots, but no identification was made. Busse testified that she was then shown the photo album taken from defendant's Arizona home and identified defendant from a picture in the album, a shirt and a gun. The women then were shown the defendant, who was sitting alone in a room. Nudo and Cottone observed defendant together, while Busse observed the defendant by herself. Busse identified defendant as the robber; Nudo failed to make an identification.

Defendant's motions to suppress the items taken from his car, and the identification of defendant by Judy Busse were denied, as was his motion *in limine* to exclude testimony about the pistol found on his person at the time of his arrest.

Defendant testified that he had been at a party the night before the events in question and that he had not awakened until 8 o'clock on the morning of July 22. He had then gone to his brother's home and had thereafter driven in a blue and white Dodge Charger to a garage, where he had some speakers installed. Defendant had arrived at the garage at approximately 9 o'clock and had stayed until sometime after noon. After having lunch, defendant had assisted his girl friend prepare for a move to Phoenix, Arizona, where defendant had been living. Defendant and his girl friend left for Arizona the following day, but their relationship deteriorated, and defendant returned home in December. He had gone to the Stardust Bowl in January because he had previously worked there as a night bartender and wanted to seek employment. He was carrying a pistol which his mother had given him after some random shots had been fired at him in an incident outside a bar. Various aspects of defendant's testimony were corroborated by his mother, brother, former girl friend, nephew, and sister-in-law, and by a neighbor of defendant's brother. A mechanic who assisted with the installation of the speakers testified that

he towed the blue-over-white Charger into Franks Garage between 8:30 and 9 a.m. on July 21, 1977, because it had no brakes. He said that the defendant was in the shop to pick up the car at approximately 10 a.m. on July 22, 1977, and then he was accompanied by his girl friend and his nephew. The witness testified also that he was a friend of the family. There was also testimony that defendant's hair style was different from that described by the robbery victims, and that various individuals other than defendant had been seen in the bowling alley on the morning of the robbery.

## I

Defendant first contends that the trial court erred in denying his motion to suppress items retrieved by the police during a warrantless search of his car. Following his arrest, defendant had been taken outside the bowling alley and questioned by the officers as to his means of transportation. Defendant pointed out a green Dodge Charger parked on the street in front of the bowling alley. Two officers were detailed to watch the car until a tow truck could arrive. One officer looked into the car's interior through the windows and saw a gold or brownish gold bowling bag on the rear seat and part of a blue bowling shirt underneath the front seat. When the tow truck arrived, the officer entered the vehicle to straighten out the steering wheel for the tow operator, but did not search or seize any items at that time. The Dodge was then towed to the police garage, where its contents were subsequently inventoried. The officer testified that, while there was no written policy on the subject, there had been a practice in effect for seven years "that any time we bring a vehicle in involved in a crime or that was used by someone who is believed to be involved in a crime, the vehicle is completely inventoried and checked for valuables or anything that should not stay with the vehicle when the vehicle is released to the tow company." While there was testimony that a form entitled "Tow Report" was prepared, there was no testimony that a written inventory of the contents found was ever made. The trial court denied the motion to suppress on the authority of *South Dakota v. Opperman* (1976), 428 U.S. 364, 49 L. Ed. 2d 1000, 96 S. Ct. 3092, dealing with inventory searches.

We cannot justify the search on this basis. The plurality opinion in *Opperman* approved routine police practice of securing and inventorying vehicles which have been properly impounded, on the basis of the need for protection of the owner's property, to protect police against claims of loss or theft, and to protect them against potentially dangerous instrumentalities contained within the vehicle. (*Opperman*, 428 U.S. 364, 369-70, 49 L. Ed. 2d 1000, 1005-06, 96 S. Ct. 3092, 3097.) Following the opinion in *Opperman*, which is premised on the proper impounding of the vehicle in

the first place, the Illinois cases also require that the police act properly in taking possession of the vehicle. *E.g., People v. Schultz* (1981), 93 Ill. App. 3d 1071, 1075-76.

■■ Here, the defendant's car was lawfully parked on a public street, and it does not appear from the record that the police had any responsibility for the vehicle or its contents. There thus was no basis upon which the police could have conducted a valid inventory search.

The State urges that the search may nevertheless be upheld as one based on probable cause and exigent circumstances. (See *Arkansas 'v. Sanders* (1979), 442 U.S. 753, 756-57, 61 L. Ed. 2d 235, 240, 99 S. Ct. 2586, 2589.) With this we agree.

Officer Tyndall, an experienced Addison police officer, testified that when he was called to the Stardust Bowl, he knew of the earlier armed robbery at that location; he had been informed that the robber was again in the bowling alley; an employee, Frances Felz, had pointed the defendant out to him when he arrived at the bowling alley and had stated "that's him. I'm afraid he's going to leave"; he and another officer had arrested defendant, and in patting him down had found that he was carrying a loaded blue steel revolver in his coat pocket. The officer knew that the robber in the July 22, 1977, occurrence was armed with a blue steel revolver and had carried a gold colored bowling bag. He knew that on the earlier occasion the robber had first been noticed in the game room of the establishment and that on this occasion he was also reported in the same area. The officer also knew from the defendant that he had come to the Stardust Bowl in the Dodge Charger which the defendant had pointed out as being parked on the street about 20 feet from the entrance.

Further, when Officer Peterson was directed by Tyndall to go to the car awaiting a tow, Peterson looked through the car window and observed in plain view a "gold, or some sort of brownish gold" bowling bag located on the rear seat, and saw a part of a blue shirt sticking out from the bucket seat on the passenger side in the front of the vehicle.

■■ Under these circumstances, we conclude that the officers had reasonable cause to seize the vehicle on the basis that it contained evidence of crime or it may have been an instrument of the July 22, 1977, crime even though the description did not exactly match in color the vehicle seen in front of the Stardust Bowl on the previous occasion. See *People v. Peter* (1973), 55 Ill. 2d 443, 454-55; *People v. Henry* (1977), 48 Ill. App. 3d 606, 609-10.

■■ The fact that the car was properly in police custody "does not of itself dispense with constitutional requirements of searches thereafter made of it." (*People v. Davis* (1981), 93 Ill. App. 3d 217, 226.) However, defendant's reliance on *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022, in support of his contention that there were no

circumstances to justify the "automobile exception" as the basis for the warrantless search, is misplaced. The car was seized in a public place, and was inadvertently discovered in the process of arresting defendant when he pointed it out. These facts distinguish *Coolidge*. The fact that the car or its contents could have been removed provides the exigent circumstances to warrant the subsequent search. *People v. Peter* (1973), 55 Ill. 2d 443, 455-56; *People v. Davis* (1981), 93 Ill. App. 3d 217, 226.

We also observe that even if the evidence seized had been wrongfully suppressed Officer Peterson could have testified to what he saw in plain view. Thus, the effect of the admission of the bowling bag and the shirt could not have significantly contributed to the conviction and would have been, in any event, harmless error.

## II

The central issue, in our view, is that of identification.

Defendant contends that Judy Busse's in-court identification of him was tainted by improperly suggestive pretrial procedures. He testified that he was placed in a small room with a one-way mirror, and that three or four women came to the window and looked in at him. There was also testimony by Patricia Nudo that "I went with * * * the other two girls" to make the identification. While somewhat equivocal, this testimony can be read as supporting defendant's claim that all of the women looked in at him together. On the other hand, Judy Busse unequivocally stated that she saw defendant alone, and that the other women were outside the viewing room at the time.

It further appears that Busse was called at home by the police and asked to come to the station because a suspect in the July robbery was in custody. Upon arriving, Busse found the other three women present and was shown a book of mug shots. None of the women identified any of the people in the book, and Busse testified that they were then shown a family photograph album. A discrepancy arose in Busse's testimony on the latter point, because it was established that this album did not come into police custody until approximately a week after the date of this initial identification. Busse testified that she made an identification from the family album, and that she was also shown a gun and told it had been found on the person taken into custody. Busse then was taken to view the defendant, and identified him as the robber. Busse further testified that she had an opportunity to observe the robber on July 22 when she made change for him, while he was in the game room and while he was committing the robbery. She testified that her in-court identification was "based on his face" and that it was the same face she had seen at the bowling alley.

■■■ Once the defendant satisfies his initial obligation of establishing that

the pretrial identification was impermissibly suggestive, the State may secure introduction of the identification by a clear and convincing showing, based on the totality of the surrounding circumstances, that the identification has resulted solely from the witnesses' observations at the time of the offense. (*People v. McTush* (1980), 81 Ill. 2d 513, 520.) Where identification testimony is reliable and there is not a substantial likelihood of irreparable misidentification, the fact that police have used suggestive identification procedures will not necessarily result in exclusion of the identification testimony. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 113-14, 53 L. Ed. 2d 140, 153-54, 97 S. Ct. 2243, 2252-53.) Among the factors to be considered in evaluating the likelihood of misidentification are the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Manson*, 432 U.S. 98, 114-16, 53 L. Ed. 2d 140, 154-55, 97 S. Ct. 2243, 2253; *McTush*, at 521.

■■ Judy Busse testified that she was shown a family album containing photographs of the defendant before she identified him at the show-up. "The belief by a witness that police attention has narrowed to an individual can be a strongly suggestive influence in making an identification." (*People v. Jackson* (1973), 54 Ill. 2d 143, 147.) However, the trial judge was not required to conclude that the witness did, in fact, see the album on January 16, 1978, when she made the identification at the police station in view of the evidence that the album was not received by the Addison police from the Arizona authorities until January 20.

■■ Nevertheless it may be reasonably argued that the showing of photos from a family album is inherently suggestive of the fact that the attention of the police has narrowed to a family member. The fact that the identification procedure at the show-up also included the showing to the witnesses, including Busse, of the gun and clothes seized from the defendant necessitate the conclusion that the procedure employed was inherently suggestive. Moreover, a one-man show-up of the defendant will generally be held unnecessarily suggestive where there was no exigency to justify such a procedure. (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 512; *People v. Stock* (1973), 15 Ill. App. 3d 722, 728.) Here, no exigency justified the procedure.

We must therefore examine the record to determine whether the State has satisfied its burden of proof to show by clear and convincing evidence that the witness' in-court identification was based solely upon her confrontation at the scene of the crime. This requires analysis of the *Manson* factors which are to be weighed against the corruptive effect of

the suggestive identification procedure. 432 U.S. 98, 114-16, 53 L. Ed. 2d 140, 154-55, 97 S. Ct. 2243, 2253.

First, the record of the witness' opportunity to view the criminal at the time of the crime includes Judy Busse's testimony that although she couldn't give an exact time she saw the robber it was "long enough at the first instance to take the dollar and give him the four quarters"; that there was fluorescent lighting; that she was within the width of a "counter top," approximately 18 to 24 inches from him; and that she looked the person in the face. She also testified that a few minutes later the robber came back into her office displaying a gun which he subsequently fired into the wall. Although the witness' degree of attention, the next factor in the *Manson* analysis, is not directly addressed in her testimony, it may be presumed that she was attentive when the robber pointed the gun at her. The other of the *Manson* factors, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by her at the time of the confrontation and the length of time between the crime and confrontation, are not as clearly satisfied by the record. The accuracy of the description which Busse offered in her trial testimony cannot be conclusively determined since the witnesses at trial disagreed as to defendant's appearance on July 22, 1977. The fact that the witness failed to identify defendant's photo from a black and white mug book detracted somewhat from the level of certainty at the time of confrontation. However, she did identify defendant from the family album, and she positively identified him through a one-way mirror at the show-up. The fact that six months intervened between the crimes and the confrontation tends to dilute the witness' memory of defendant's appearance at the crime as opposed to the time of the January 16 identification procedure.

■■ We conclude, however, that under the totality of the circumstances there did not appear the substantial likelihood of misidentification which would result in the suppression of the Busse testimony. An independent origin for her testimony was established by the circumstances that she had several opportunities to observe the defendant in good light on the day of the robbery; her identification was based upon the robber's features; her in-court identification was positive; and she testified that her in-court identification was based on her recall of defendant's face on the day of the robbery. See *People v. Daniels* (1979), 73 Ill. App. 3d 394, 397; *People v. Dortch* (1978), 64 Ill. App. 3d 894, 898-99.

■■ Moreover, defendant's conviction did not depend upon the testimony of Judy Busse alone. There was strong identification testimony by another eye witness to the robbery, Frances Felz. It is well established that where the identification is in issue, the testimony of one credible witness is sufficient to convict when it is shown that the witness viewed

the accused under circumstances which permit a positive identification to be made even though the testimony is contradicted by the accused. See, *e.g., People v. Manion* (1977), 67 Ill. 2d 564, 578.

### III

The defendant contends that the trial court committed prejudicial error in the admission of evidence concerning a handgun found on defendant's person at the time of his arrest where the State stipulated that it was not the weapon used in the robbery.

The contention must be viewed in the light of a number of facts in the record. Prior to trial, on defendant's motion, an unrelated charge alleging the theft of a firearm was severed from the instant case; and the defendant moved *in limine* to exclude evidence of the gun seized at the time of defendant's arrest in this trial. The judge ruled that the State was entitled to show that defendant was carrying the gun at the time of his arrest but that the gun itself was not admissible in evidence. At trial, the State called Officer McCallum, who testified to the discovery of the weapon on his "pat-down" of the defendant at the time of the arrest.

On cross-examination of McCallum defense counsel sought to establish that he had the gun with him when he questioned Frances Felz at the time of the arrest. A further question, whether Frances Felz had seen the gun, was objected to. In chambers, the court cautioned defense counsel that he was possibly "opening the door" to the jury's seeing the gun. Counsel refused to withdraw the question and received an answer from the witness in the jury's presence that the officer did not remember showing the gun to Felz. Subsequently the State moved to show the gun to the jury. Over defense counsel's objection, the court ruled that he would allow the State to go into the identification of the gun conditioned upon its establishing that it was not the gun used in the robbery. The State stipulated that it was not the gun used in the robbery, but defense counsel insisted that the matter be proved before the jury. Defendant's counsel on cross-examination of Officer Tyndall elicited testimony that after the arrest the officer questioned whether the gun was used in the robbery, but after a ballistics test it was determined that it was not the same gun used in the robbery. The State then moved to have the gun introduced into evidence, but this was denied.

The State argues that the claim of error involving the rulings as to the gun have been waived by the action of the defense counsel in pursuing the matter of the gun at trial and in a cross-examination. In *People v. Spates* (1979), 77 Ill. 2d 193, the Illinois Supreme Court held that the defendant had properly preserved for review the admissibility of defendant's conviction of misdemeanor theft even though his motion *in limine* had been denied and he had himself introduced the prior misdemeanor

conviction as a tactical measure. The court noted that after the denial of a motion *in limine* a party has the right to limit the effect of the matter without having waived the issue. (77 Ill. 2d 193, 199-200.) *Spates* may be distinguished in that here defense counsel chose to affirmatively use the evidence of the gun to attempt to establish that it was a substantial factor in the identification of the defendant to support his theory that the identification procedure was unduly suggestive.

In any event, we find no prejudicial error in the trial court's rulings. We acknowledge the general rule that it is error to admit a gun found in a defendant's possession when arrested, where there is no connection between the gun and the charged offense. (*E.g., People v. Pointer* (1981), 93 Ill. App. 3d 1064, 1070.) There is some inconsistency in the authorities as to whether the suitability of the weapon in the commission of the offense may be shown when the prosecution concedes that the particular weapon was not used in the crime.

In *People v. Wade* (1977), 51 Ill. App. 3d 721, principally relied upon by the defendant, the conviction of murder was reversed when evidence of a gun not used in the crime charged was admitted. However, the court noted that the State "elicited considerable testimony from the officer concerning the gun," including the information that the defendant had additional ammunition in his pocket, that the .357 Magnum would pierce a car's bumper, and that the car in which the victim was killed showed a large hole in the rear bumper. (51 Ill. App. 3d 721, 723.) In addition, in *Wade* the officers testified to their investigation of defendant's involvement in five other crimes. (51 Ill. App. 3d 721, 728.) In a number of cases relied upon by the State the admission of a gun found on a defendant at the time of his arrest, although not claimed to be used in the crime, has been held not to constitute reversible error. *E.g., People v. Braxton* (1980), 81 Ill. App. 3d 808, 817; *People v. Upshire* (1978), 62 Ill. App. 3d 248, 252; *People v. Hagen* (1978), 63 Ill. App. 3d 944, 949. See also *People v. Longstreet* (1974), 23 Ill. App. 3d 874, 882; *People v. LeBron* (1980), 83 Ill. App. 3d 598, 603.

We will not attempt to reconcile all of the cases. Under the particular circumstance found in this case, we conclude that the denial of the motion *in limine* and the subsequent ruling that the gun could be referred to in relating the circumstances of the arrest and shown to the jury, but that the gun itself was not admissible in evidence, was not error.

In *People v. Moore* (1969), 42 Ill. 2d 73, 78, the crime charged admittedly involved the use of a shotgun and the State displayed to the jury the handgun and holster found on Moore at the time of his arrest some six months following the crime. The defendant contended that the severe prejudice involved in the display was not alleviated by the instruction of the court to disregard it and the ruling that the gun and

holster were not to be admitted in evidence. The court disagreed. The testimony regarding the circumstances of the arrest, including those relating to the gun and holster, was held proper, the court noting:

> "We think that despite the length of time between the crime and the arrest, testimony regarding the circumstances of the arrest was admissible, including testimony relating to the weapons found in defendant's possession or control at the time of the arrest." (42 Ill. 2d 73, 78.)

Here, only the testimony that the gun was found on defendant's person when arrested and that it was not the gun used in the robbery would have gone to the jury under the court's ruling. The fact that the gun was ultimately displayed to the jury was the clear result of the tactics of the defense.

## IV

The defendant next asserts that his right of meaningful cross-examination of identification witnesses was infringed when the trial court granted a motion *in limine* excluding use of a police composite sketch compiled after the robbery and when the court sustained prosecution objections to questions about statements by Kay Cottone during the identification process.

In *People v. Rogers* (1980), 81 Ill. 2d 571, the Illinois Supreme Court resolved any previous uncertainty as to testimony relating to out-of-court identification involving composite sketches, and ruled that where the identifier is present at trial, a composite sketch is admissible either as corroborative of the witness' testimony or in cross-examination, as a prior extrajudicial statement not barred by the hearsay rule. 81 Ill. 2d 571, 580. See also *People v. Tyllas* (1981), 96 Ill. App. 3d 1, 4.

■■ ■ The State argues that *Rogers* should not be given a retroactive effect. We disagree since, as the supreme court ruled in *Rogers*, the admission of prior identification evidence has long been allowed where the identifier is present at trial and available for cross-examination. (81 Ill. 2d 571, 580.) Moreover, as the evidence involves the truth-finding function, retroactive effect should be afforded to the decision in any event. (See *Hankerson v. North Carolina* (1977), 432 U.S. 233, 53 L. Ed. 2d 306, 97 S. Ct. 2339.) However, we conclude that the error is harmless in the particular circumstances of this case because the composite was the result of group description and therefore cross-examination of the three witnesses (the fourth having died) would not have established responsibility for individual features on the composite. Thus it would not have served as any more a useful method of impeachment than the individual cross-examination.

Defendant further maintains that the trial court erred in sustaining objections to his efforts to cross-examine Mrs. Busse as to whether there were any photographs of defendant in the family picture album which she had been unable to identify. The court also precluded inquiry concerning whether Kay Cottone had told Busse that defendant had come back to rob the bowling alley again or had said anything to Patricia Nudo at the time of the identification. In our view, the rulings of the trial court on these points were erroneous. However, we do not believe that defendant was prejudiced. Questions concerning Mrs. Busse's failure to identify various pictures from the family album were not beyond the scope of a direct examination which had dealt with an identification of pictures in that album, but the jury was most likely not misled on this point. Busse testified that she picked out only one photograph from the family album, establishing by implication that she had not identified any other picture in that book. Moreover, such an inquiry was pointless, since a witness who has identified only one picture necessarily could not know the number of other photographs in which defendant appeared. As to the questions concerning the role of Mrs. Cottone, it appears that the trial court felt that an extrajudicial statement is hearsay unless the declarant is available for cross-examination. Although such a statement, not offered for its truth, is not hearsay, the trial court's error was also harmless. Mrs. Busse elsewhere testified that if she had a conversation with the other women prior to making the identification, it was nothing she could remember. Patricia Nudo, despite any conversation which may have occurred, was unable to identify defendant at the show-up. Defendant thus suffered no prejudice from the court's rulings.

V

Defendant also challenges the trial court's exclusion *in limine* of expert testimony from Dr. Terrence Luce on the reliability of eyewitness identification, and specifically that there is no relationship between an individual's confidence in his ability to identify another and the accuracy of the identification, and that an identification resulting from a group consensus is 40-50 percent more inaccurate than an individual identification. This court recently discussed the subject of expert testimony in the area of cross-racial identification in *People v. Dixon* (1980), 87 Ill. App. 3d 814. In that case, also involving testimony by Dr. Luce, the court concluded that expert opinions may not be admitted on matters of common knowledge unless the subject is difficult of comprehension and explanation. The court concluded that expert testimony in the area of cross-racial identification was inadmissible. In the course of its holding, the court observed that "the trustworthiness of eyewitness observations is

not generally beyond the common knowledge and experience of the average juror and is, therefore, not a proper subject for expert testimony." *Dixon*, at 818.

The courts have uniformly upheld a trial court's refusal to allow expert testimony on the subject of eye witness identification. (See, *e.g.*, *United States v. Brown* (10th Cir. 1976), 540 F.2d 1048, 1054 *cert. denied* (1977), 429 U.S. 1100, 51 L. Ed. 2d 549, 97 S. Ct. 1122; *Smith v. United States* (D.C. App. 1978), 389 A.2d 1356, *cert. denied* (1978), 439 U.S. 1048, 58 L. Ed. 2d 707, 99 S. Ct. 726; *State v. Valentia* (1977), 118 Ariz. 136, 575 P.2d 335, 337; *Nelson v. State* (Fla. App. 1978), 362 So. 2d 1017, 1021; *State v. Fernald* (Me. 1979), 397 A.2d 194, 197; *State v. Porraro* (R.I. 1979), 404 A.2d 465, 471.) These courts have generally held that factors such as stress, opportunity to observe, distortion of memory, and problems of interracial identification, are within the realm of common experience and can be evaluated by the jury without expert assistance.

■■ Defendant asserts that *Dixon* is distinguishable because there the expert testimony confirmed generally held views, whereas here Luce's testimony would have run counter to common experience. However, we find little in the circumstances of this case differing from the usual problems of identification which historically have been within the province of the jury which has the benefit of cross-examination to point out various inconsistencies and to assess the opportunity of the witness to accurately observe. We therefore conclude that the trial court did not abuse its discretion in disallowing the expert testimony.

## VI

■■ Defendant further maintains that the trial court erred in refusing rehabilitation testimony by an alibi witness, Susan Romano, who had claimed to recall defendant's activities on July 22, 1977, because that was the day before her first anniversary. The State subsequently introduced a marriage license showing that the witness had been married on September 10, 1976. The defense made an offer of proof that the witness would testify that she and her husband, with whom she had lived prior to marriage, celebrated a "fictitious anniversary" on July 23 because of their child. The trial court precluded such testimony. The trial court's ruling was erroneous, given the well-established rule that a witness who has been impeached by proof of a prior inconsistency should be allowed the opportunity to rehabilitate his credibility. (*People v. Hanson* (1980), 83 Ill. App. 3d 1108, 1114.) However, defendant failed to include this allegation of error in his post-trial motion and therefore has waived this issue unless it falls within the ambit of the plain-error rule. (*People v. Jackson* (1981), 84 Ill. 2d 350, 359-60.) Although the impeachment evidence was damaging to the credibility of the witness, and the strength of defendant's alibi was

accordingly impaired, the trial court's ruling was not plain error in view of the fact that there were a number of other alibi witnesses and in view of the jury's refusal to accept the credibility of the alibi testimony generally. The trial court's error was therefore waived.

## VII

■■ Finally, defendant challenges several remarks made in the course of the State's closing argument, characterizing the alibi witnesses as liars and the defense as fraudulent and fabricated. Defendant takes particular exception to remarks portraying the testimony of defendant's 14-year-old nephew as "the most unconscionable use of a human being and disregard of human dignity ° ° °." In response, the State notes that defendant offered no contemporaneous objection to these remarks and contends that any error is therefore waived. Defendant counters that *People v. Jackson* (1981), 84 Ill. 2d 350, 359, indicates that error will be preserved for review where the objection is made either contemporaneously or in the post-trial motion. Although *Jackson* involved a case where there had been neither a contemporaneous nor a post-trial objection, we do not read the opinion as having been intended to relax the rule that objections must be both raised at trial and in the post-trial motion. Assessing the remarks in question for plain error, we believe that none was present. It is improper for the prosecutor to state in argument that the defendant or a defense witness has lied unless such a remark is based upon the evidence or a reasonable inference drawn therefrom. (*People v. Anderson* (1981), 95 Ill. App. 3d 492, 495.) A reading of the argument to which defendant objects discloses that the characterization of the defense testimony and evidence as false was accompanied by a statement of reasons why the State so characterized it. The prosecution's remarks concerning defendant's nephew did not relate so much to the contents of his testimony as to defendant's motives for calling him as a witness. As such, scant attention was focused on this witness' testimony, but rather the prosecutor castigated the defense for having taken advantage of a vulnerable youngster. This remark was unmistakably invective and tended to stigmatize the defense as a whole, but we are nonetheless unable to say that it constituted a material factor in the conviction so as to rise to the level of plain error.

We therefore affirm the judgment.

Affirmed.

NASH and VAN DEUSEN, JJ., concur.