THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EFREM CLARK *et al.*, Defendants-Appellants.

First District (2nd Division)   Nos. 82—1476, 82—1492, 82—1506 cons.

Opinion filed May 8, 1984.

Thomas F. Geraghty, of Northwestern University Legal Clinic, of Chicago, for appellant Johnnie Brown.

Steven Clark and Martin Carlson, both of State Appellate Defender's Office, of Chicago, for appellant Efrem Clark.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Thomas Gearen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PERLIN delivered the opinion of the court:

Defendants Efrem Clark (Clark) and Johnnie Brown (Brown) were indicted jointly on two counts of rape, two counts of armed robbery, two counts of aggravated kidnaping and two counts of armed violence. Prior to trial, the court approved the State's motion to *nolle prosequi* the armed violence counts. On May 11, 1982, following a consolidated jury trial in the circuit court of Cook County, defendants

were found guilty of rape (Ill. Rev. Stat. 1979, ch. 38, par. 11—1), armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2), and aggravated kidnaping (Ill. Rev. Stat. 1979, ch. 38, par. 10—2). On May 27, 1982, Clark was sentenced to four concurrent terms of 20 years on two counts of rape and two counts of armed robbery, and concurrently to two terms of 15 years on two counts of aggravated kidnaping. These sentences were to run consecutive to two sentences of 10 and 15 years respectively previously imposed for two prior armed robbery offenses. Brown was sentenced to six concurrent terms of 10 years on two counts of rape, two counts of armed robbery and two counts of aggravated kidnaping. These sentences were to run consecutive to a sentence of six years previously imposed upon him for a prior armed robbery offense.

Both defendants appeal, presenting the following issues for review: (1) whether defendants' fifth amendment right against double jeopardy was violated; (2) whether the trial court erred in excluding expert testimony regarding the reliability of eyewitness identification; (3) whether defendants were denied a fair trial when evidence of another crime was introduced against them; and (4) whether the trial court erred in imposing consecutive sentences. Clark additionally raises the issue of whether the trial court erred in imposing upon him sentences for six separate offenses. Brown also presents as additional issues for review: (1) whether defendant was proven guilty beyond a reasonable doubt; (2) whether defendant's lineup identification was impermissibly suggestive; and (3) whether defendant was denied a fair trial because evidence favorable to him was destroyed.

For the reasons hereinafter set forth, we affirm in part and we vacate three of the sentences imposed by the trial court.

This case was originally assigned to circuit court Judge Genesen. On January 18, 1982, at pretrial proceedings before Judge Genesen, counsel for both defendants filed a motion *in limine* to exclude the testimony of a State's witness, Mr. Major Barrow, because his testimony would relate to a separate offense of armed robbery against Barrow and would be prejudicial to defendants in the case *sub judice*. The State argued that Barrow's testimony was relevant to establish defendants' identities, and stated to Judge Genesen, "*** we would readily concede we are not going into all the minute details of the Major Barrow's case. ***" The court found Barrow's testimony to be relevant to the question of the identity of defendants and denied their motion.

The State then filed an oral motion *in limine* to exclude the testimony of Dr. Reid Hastie, a psychologist whom the defense intended

to call as an expert on eyewitness identification. The court ruled that factors bearing on eyewitness identification are matters of "common knowledge," and granted the State's motion to exclude Dr. Hastie's testimony.

Defendant Brown filed a motion to suppress his lineup identification, alleging that the clothing ("grey or silvery jacket") worn by him in the lineup was "distinctive" and impermissibly suggestive. On February 1, 1982, following an evidentiary hearing, Judge Genesen found there was not "such a suggestive identification procedure as to cause the identification to be tainted," and denied defendant's motion.

On February 3, 1982, at trial before Judge Genesen and a jury, the State's first witness, Mr. Major Barrow, testified: on February 21, 1980, at approximately 11:15 p.m., he was struck on the head from behind as he was about to open his car door; he turned around and saw two men holding guns; one man hit Barrow with his gun and said, "Let's kill him"; the other man took money out of Barrow's pocket while the first man said, "Where's his wallet, where's his wallet?" In court, Barrow identified defendants as his two assailants.

At this point, Judge Genesen called the attorneys into chambers where he stated that Barrow's testimony was exceeding the scope of the court's *in limine* ruling by eliciting details of the offense allegedly committed by defendants against Barrow. The State argued that its elicitation of the details of the offense against Barrow was not "intentional" or "purposeful." Judge Genesen, however, found the State had "deliberately elicited prejudicial testimony." The judge stated, "if the defense wants a mistrial, I am going to grant it." Both defendants moved for a mistrial. Judge Genesen declared a mistrial and recused himself.

The case was reassigned to circuit court Judge Marovich. On February 17, 1982, at pretrial proceedings before Judge Marovich, defendants filed a motion to dismiss the indictment on grounds of double jeopardy. The court found the prosecutor's conduct was not "specifically designed to provoke mistrial," and denied defendants' motion to dismiss.

Brown's counsel renewed his motion to suppress Brown's lineup identification and both defendants renewed their motion *in limine* to bar the testimony of Barrow. The court denied both of these motions and admonished the State not to elicit details of the offense against Barrow. Defendants also renewed their request to call Dr. Hastie as a witness. The court found there was "no need for an expert to give an opinion" on the inherent dangers in eyewitness testimony and denied defendants' motion.

On May 6, 1982, at trial before Judge Marovich, Barrow again testified to the following: on February 21, 1980, at approximately 11:15 p.m., he was struck on the head from behind as he was about to enter his car near 69th and Bishop, in Chicago. He turned around and saw a man with a gun standing directly in front of him. A "taller" man holding a gun was standing off to the side. "The lighting conditions were good because [his] car was parked directly up under the light." The "shorter" man reached into Barrow's pocket and took his money and wallet. The taller man reached into Barrow's car and took his car keys. The shorter man pushed Barrow into the bushes. Both men then drove off in Barrow's car. On the night of the robbery, Barrow told police the shorter man was about 17 to 22 years old and his height was "five three to five seven to five nine." Barrow did not give to the police any age or height description with respect to the taller man. In court, Barrow identified defendant Clark as the taller assailant, and defendant Brown as the shorter assailant. Barrow described the car he was driving as a 1972 green Dodge Polara.

M.G., one of the complainants, testified: on February 22, 1980, shortly after midnight,[1] she drove her sister-in-law, complainant D.G., to D.G.'s home at 115th and Bishop, in Chicago; when they pulled up in front of the house, their car was bumped from the rear by another car; two men wearing ski masks and holding guns jumped out of the car; one man approached D.G., placed a gun to her head, and told her to get into the back seat of M.G.'s car; the other man approached M.G. and told her to get into the back seat of the same car; the shorter man sat in the front passenger seat, and the taller man got into the driver's seat of M.G.'s car;[2] they drove off and defendants repeatedly told M.G. and D.G. to keep their eyes closed and threatened to kill them. During the drive, Brown, who had removed his ski mask, grabbed M.G.'s purse; M.G. was able to see Brown's face because she was "peeking" with her eyes partially open; they parked in an alley illuminated by pole lights; D.G. was told to get into the front seat; Clark got into the back seat and ordered M.G. to remove her clothes; M.G. was "peeping" and was able to see Clark's face "just for a second"; Clark "fumbled" with M.G.'s breasts, and the two men then switched places; Brown took $5, two gold chains and a wedding ring from M.G. M.G. was ordered to remove the rest of her clothes and Brown pushed her down in the seat and raped her; M.G. opened her

[1]Approximately one hour after the theft of Barrow's car.

[2]At the lineup held on February 23, 1980, M.G. identified Brown as the shorter assailant, and Clark as the taller man.

eyes and observed Clark, who had his ski mask pulled up, in the front seat; she was able to observe his face for three to four minutes. Two gold chains taken from Brown after his arrest were identified by M.G. as her property. A key chain with M.G.'s car key, found on Clark after his arrest, was also identified by M.G. as belonging to her.

Complainant D.G. testified to the following: defendant Brown, while in the front seat of M.G.'s car, took D.G.'s watch and ordered her to remove her clothes. Defendant Clark then moved to the front seat of the car and ordered D.G. to remove the rest of her clothes. Clark pulled up his ski mask and D.G. was able to view his face before he raped her. D.G. and M.G. were told to get dressed. Defendants again threatened to kill D.G. and M.G. D.G. was ordered out of the car and told to walk to a nearby fence. Defendants kept M.G. in the car for a few more minutes and then released her. Defendants drove off in the M.G. car. D.G. and M.G. ran to a nearby liquor store and called D.G.'s mother-in-law. D.G. and M.G. were taken by the police to the police station where they described one assailant as approximately five foot nine and the other assailant as about six feet tall, and stated that one man was "dark" and the other was "light."

At a lineup held on February 23, 1980, D.G. identified Brown, but was unable by sight to identify Clark. After the men in the lineup spoke, however, she identified Clark by his voice.

Patrolman Ronald Bartman, of the Chicago police department, testified: on February 22, 1980, at approximately 12:15 a.m., he responded to a call at 11458 South Bishop. A 1972 green Dodge was parked on the street with the engine running. Bartman had this car taken to the 22nd district police station.

Officer Beale, of the Chicago police department, testified: on February 23, 1980, at approximately 2:40 a.m., he responded to a call of a battery in progress at 6900 South Yale, in Chicago. Beale saw "three to four male blacks fighting on the street." Clark, one of the men, ran from the fight and Officer Beale chased and arrested him. Officer Beale searched Clark and found several key chains.

Detective Bresingham, a Chicago police officer, testified: on February 23, 1980, at approximately 6:30 a.m., while investigating the instant case at the 7th district police station, he observed two yellow metal chains around Brown's neck. He requested Brown to remove these chains and "inventoried" the chains. These were the chains later identified as belonging to M.G.

Kathy Moorman, a microanalyst for the Chicago police crime laboratory, testified: in December 1981 she performed tests on specimens contained in Vitullo Evidence Kits which had been prepared on Febru-

ary 22, 1980, when D.G. and M.G. were brought by the police to the Little Company of Mary Hospital. Moorman found sperm present on slides which contained vaginal swabs taken from D.G. and M.G. She found semen present on M.G.'s underwear but nothing "significant" on D.G.'s underwear. Moorman tested blood and saliva samples from the complainants and from the defendants in an effort to identify the alleged rapists. She concluded from these tests that Brown did not secrete his "blood type" into his body fluids. He was characterized as a "non-secretor." Moorman also performed blood typing tests on the semen stains and obtained four varying results. Moorman stated that the tests were inconclusive because the stains had been prepared on February 22, 1980, almost two years prior to her tests, and the stains had deteriorated due to this passage of time.

Defendant Brown presented an alibi defense through testimony of Marie Miller, his "girlfriend"; April Brown, his sister; and Gregory Neuvel, his sister's "boyfriend." All three testified that they spent the night of February 21, 1980, at the home of Brown's mother.

Brown's mother testified that the gold chains removed from Brown's neck after his arrest belonged to her.

*Jimmy* Brown, a friend of defendant Clark, testified: during February 1980 he never saw Clark with defendant *Johnnie* Brown. On February 23, 1980, he walked with Clark to the vicinity of 69th and Yale and observed a fight between defendant Brown and a second man. When the police arrived at the scene of the fight, however, "everyone ran."

Louis Vitullo, former chief microanalyst for the Chicago police department, testified: on February 22, 1980, Vitullo Evidence Kits were prepared at the Little Company of Mary Hospital. These evidence kits, however, were not tested by Vitullo until February 1982. He performed a semen typing test on M.G.'s underwear and found the "possible presence of H-substance" which could not be left by a non-secretor. Vitullo stated that due to the age of the stains, however, the tests were inconclusive.

At trial, defendants were found guilty of rape, armed robbery and aggravated kidnaping.

Defendants filed timely notices of appeal.

I

■■ Defendants contend that double jeopardy bars their reprosecution because the prosecutor "intentionally" provoked defendants' motion for a mistrial in the first trial before Judge Genesen.

A defendant may invoke the bar of double jeopardy where "the

conduct giving rise to [a] successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial" (*Oregon v. Kennedy* (1982), 456 U.S. 667, 679, 72 L. Ed. 2d 416, 427, 102 S. Ct. 2083, 2091). This standard has been applied by this court. *People v. Franklin* (1983), 119 Ill. App. 3d 899, 457 N.E.2d 169.

In the instant case, however, the trial judge found that the prosecutor did not intend to provoke a mistrial. The prosecutor sought to establish Barrow's ability to identify defendants, and in so doing, found it necessary to elicit certain details of the offense against Barrow. We cannot dispute the trial court's finding and, in our opinion, the retrial of defendants is not barred by double jeopardy.

## II

■ Defendants contend that the trial court erred when it excluded the proffered "expert testimony" of Dr. Hastie with regard to the reliability of "eyewitness identification." The trial court found that "most jurors" are in fact aware of the dangers inherent in such identification.

"*** [T]he trustworthiness of eyewitness observations is not generally beyond the common knowledge and experience of the average juror and is, therefore, not a proper subject for expert testimony." *People v. Dixon* (1980), 87 Ill. App. 3d 814, 818, 410 N.E.2d 252, 256.

As stated in *People v. Brown* (1981), 100 Ill. App. 3d 57, 72, 426 N.E.2d 575, 584, "The courts have uniformly upheld a trial court's refusal to allow expert testimony on the subject of eyewitness identification. [Citations.] These courts have generally held that factors such as stress, opportunity to observe, distortion of memory, and problems of interracial identification, are within the realm of common experience and can be evaluated by the jury without expert assistance."

In the instant case, defense counsel, in his offer of proof, stated that the psychologist, Dr. Hastie, would testify that: "(1) stress does not necessarily help one's ability to see and remember; (2) a witness' confidence on the witness stand is not necessarily indicative of his reliability; (3) complicated situations adversely affect one's ability to remember; (4) one tends to focus on a weapon which is pointed at him, rather than on the person holding it; and (5) a person's initial identification of another person can be reinforced by immaterial factors."

These five factors that Dr. Hastie purportedly intended to emphasize do not differ substantially from the "usual problems of identification which historically have been within the province of the jury which has the benefit of cross-examination to point out various inconsistencies and to assess the opportunity of the witness to accurately ob-

serve." *People v. Brown* (1981), 100 Ill. App. 3d 57, 72, 426 N.E.2d 575, 585.

In our opinion, the trial court did not err in excluding "expert testimony" on this matter.

## III

██ Defendants contend that they were denied a fair trial because the trial court "erroneously" denied their motion *in limine* to exclude Barrow's testimony and admitted evidence of the armed robbery offense against him. The State argues defendants have waived this issue by cross-examining the witness (Barrow) regarding the "other offense." Assuming *arguendo*, that defendants have not waived this issue, the State further argues that it was proper for the trial court to admit evidence of the Barrow incident in order to prove the identity of the assailants in the instant case.

Evidence of crimes other than the one for which the accused is being tried is generally inadmissible. However, there are exceptions. Evidence which tends to prove a fact in issue and evidence which goes to show motive, intent, identity, absence of mistake or *modus operandi* is admissible even though it may show the commission of a separate offense (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489). The problem of determining the admissibility of other crimes is essentially one of balancing. "Even where it has substantial relevance for a permitted purpose, evidence of another crime should not be admitted if its probative value is outweighed by its prejudicial effect. [Citations.] Moreover, the actual need for the evidence must be considered in light of other evidence available to the prosecution." *People v. Triplett* (1981), 99 Ill. App. 3d 1077, 1082, 425 N.E.2d 1236, 1240.

In the instant case the judge permitted Barrow's testimony in order to establish defendants' identities. Barrow's testimony was relevant to place defendants in proximity to the time and place of the crimes here charged. Barrow was the only State's witness, other than the complainants, who could identify defendants. Barrow's description of defendants and the lighting conditions at the time of the offense were necessary to establish Barrow's opportunity for identification. In our opinion, the probative value of Barrow's testimony was not outweighed by the prejudicial effect of such testimony. The trial court's action was not error.

## IV

██ Defendants contend that the trial court erred in imposing con-

secutive sentences for two offenses "committed as a part of a single course of conduct." The trial court found that the crime against Barrow was separate and distinct from the crimes against the complainants in the instant case. Moreover, the court felt justified in imposing consecutive sentences because it feared that the public needed protection from further criminal conduct by the defendants.

Section 5—8—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4) provides:

> "Sec. 5—8—4. Concurrent and Consecutive Terms of Imprisonment. (a) When multiple sentences of imprisonment are imposed on a defendant at the same time, or when a term of imprisonment is imposed on a defendant who is already subject to sentence in this State or in another State, or for a sentence imposed by any district court of the United States, the sentences shall run concurrently or consecutively as determined by the court. *The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective,* unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sentences to run consecutively. Sentences shall run concurrently unless otherwise specified by the court.
>
> (b) *The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant,* the basis for which the court shall set forth in the record." (Emphasis added.)

"A trial court may *** impose consecutive prison sentences upon a defendant where, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such is necessary to protect the public from further criminal conduct by the defendant and where the offenses were not committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective." *People v. Craig* (1977), 47 Ill. App. 3d 242, 253-54, 361 N.E.2d 736, 745.

We believe that defendants' offense against Barrow was a distinct and separate offense from the crimes in the instant case. The armed robbery of Barrow was a completed offense when the crimes against D.G. and M.G. were committed. There was clearly a change in the nature of the criminal objective between the armed robbery of Barrow

and the offenses committed upon complainants. We find the trial court did not err in imposing consecutive sentences.

## V

■■ Defendant Clark additionally contends that the trial court erred in imposing upon him a separate sentence on each of the six counts charged in the indictment (two counts of rape, two counts of armed robbery and two counts of aggravated kidnaping) because the jury signed and returned only three verdict forms, finding defendant Clark "guilty of the offense of rape," "guilty of the offense of armed robbery," and "guilty of the offense of aggravated kidnapping."

The record indicates the jury was given the following six verdict forms as to defendant Clark:

(1) "We, the Jury, find the Defendant, Efrem Clark, Guilty of the offense of Rape."

(2) "We, the Jury, find the Defendant, Efrem Clark, Not Guilty of the offense of Rape."

(3) "We, the Jury, find the Defendant, Efrem Clark, Guilty of the offense of Armed Robbery."

(4) "We, the Jury, find the Defendant, Efrem Clark, Not Guilty of the offense of Armed Robbery."

(5) "We, the Jury, find the Defendant, Efrem Clark, Guilty of the offense of Aggravated Kidnapping."

(6) "We, the Jury, find the Defendant, Efrem Clark, Not Guilty of the offense of Aggravated Kidnapping."

The jury was not given verdict forms for six separate offenses.[3]

"Sentence cannot be imposed for offenses which did not result in a judgment or conviction by the jury." (*People v. Baes* (1981), 94 Ill. App. 3d 741, 746, 419 N.E.2d 47, 51.) In the instant case, although defendant was charged with six separate offenses, the jury returned only the three signed "Guilty" verdict forms supplied to them.

Since the jury convicted defendant of only three offenses, sentences cannot be imposed for six offenses. We must, therefore, vacate the sentences imposed for three of the counts (one count of rape, one count of armed robbery and one count of aggravated kidnaping).

Defendant argues, in the event this court vacates the sentences imposed on the three charges not supported by the jury's verdicts, that we must remand the cause for resentencing on the three convictions supported by the jury's verdicts. He contends that such action is necessary to guard against the possibility that the three improper sen-

---

[3]This same procedure was followed with respect to defendant Brown.

tences influenced the trial court's three valid sentences.

In determining, when a reviewing court has vacated some, but not all convictions, whether a remand for resentencing is required, it is necessary to determine from the record whether the trial court may have been influenced by the convictions subsequently vacated in its sentencing on the affirmed convictions (*People v. Miles* (1981), 96 Ill. App. 3d 721, 422 N.E.2d 5; *People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48). If the record indicates that the trial court was not so influenced, remand for resentencing is not required.

Our review of this record indicates that the trial judge was not influenced by the three vacated sentences. He based his sentencing on: the heinous nature of the crime; defendant's criminal record which included two prior separate Class X felony convictions by a 21-year-old; a probation unsatisfactorily terminated by defendant; defendant's lack of rehabilitative potential; and the absence of mitigating factors.

Moreover, the sentences imposed for each of the jury's convictions fall within the permissible range of sentences allowed by statute (*People v. Jones* (1980), 89 Ill. App. 3d 1030, 412 N.E.2d 683). We find no need to remand this cause for resentencing.

## VI

■ Defendant Brown raises three additional issues for review. First, defendant contends he was not proven guilty beyond a reasonable doubt. Defendant argues that the State's witnesses "did not have a good opportunity to view their assailants," in that Barrow was hit over the head before he first saw defendants, and the complainants were confronted by assailants who wore ski masks. Defendant further maintains that alibi witnesses placed him at his mother's home at the time of the offenses.

"In a jury trial the credibility of the witnesses and the weight to be given their testimony are matters within the province of the jury, and a reviewing court will not substitute its judgment for that of the trier of fact unless the evidence is so unsatisfactory, improbable or implausible as to justify a reasonable doubt as to defendant's guilt." *People v. Goodman* (1982), 109 Ill. App. 3d 203, 217, 440 N.E.2d 345, 354.

" '[W]here the identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and he viewed the accused under such circumstances as would permit a positive identification to be made.' " *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1320; *People v. Johnson* (1981), 97 Ill.

App. 3d 1055, 1070, 423 N.E.2d 1206, 1217.

In the instant case, the complainants and Barrow testified to the sufficiency of the lighting conditions where the attacks occurred; during the rape, defendant removed his ski mask giving the complainants an opportunity to view him; and defendant was identified in a lineup held one day after the commission of the crimes. Our review of the record indicates that the victims' testimony with regard to their assailants' identification was clear and consistent. We believe the evidence fully supported the jury's verdict.

## VII

■ Defendant Brown contends that his lineup identification was impermissibly suggestive. Defendant alleges that he was identified in a five-member lineup while wearing "distinctive," suggestive clothing ("grey or silver jacket"); the source of complainants' in-court identification was the suggestive lineup; and evidence of this identification was therefore improperly admitted at trial.

"Pretrial identifications which are overly suggestive are not *per se* violative of a defendant's confrontation and due process rights. Evidence of such identifications is admissible if, based on the totality of the circumstances, the identification possesses sufficient indicia of reliability. The relevant factors in evaluating the reliability of such identifications are: (1) the opportunity of the witness to view the defendant at the time of the crime; (2) the witness' degree of attention to the details of the crime and the criminal; (3) the accuracy of the witness' preidentification description of the criminal; (4) the level of certainty demonstrated by the witness in identifying the defendant as the culprit; and (5) the amount of time elapsed between the commission of the crime and the identification." *People v. Walton* (1982), 107 Ill. App. 3d 698, 701, 437 N.E.2d 1273, 1275.

In this instance, the circumstances surrounding the victims' pretrial identification of defendant establishes sufficient *indicia* of reliability. The complainants had an opportunity to view defendant without his ski mask; their attention was clearly focused on defendants; and both complainants identified Brown in the lineup held one day after the commission of the instant crimes.

The clothing which defendant claims is "distinctive" and "suggestive" is a "grey or silver jacket." We do not consider this attire to be impermissibly suggestive. We find no substantial likelihood of misidentification arising from the lineup, and hold, on the totality of the circumstances, the out-of-court identification to be reliable.

## VIII

■ Defendant Brown contends finally that he was denied a fair trial because the State failed to preserve allegedly exculpatory evidence by its two-year delay in testing specimens contained in the Vitullo Evidence Kit. Defendant suggested that if such evidence were available he might have been found innocent. Defendant at no time prior to trial, however, requested access to this evidence.

The State argues that its failure to preserve the specimens was not intentional or indicative of bad faith.

The suppression by the prosecution, without regard to the prosecution's good or bad faith, of evidence favorable to an accused, violates due process if the evidence is material to guilt and is requested by the defendant. (*Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) "For there to have been a violation of the right to due process, it must be shown that the evidence was suppressed following a request for it by the defendant, that the evidence was favorable to the defendant, and that it was material." *People v. Nichols* (1976), 63 Ill. 2d 443, 446, 349 N.E.2d 40, 42.

In *People v. Utinans* (1977), 55 Ill. App. 3d 306, 320, 370 N.E.2d 1080, 1090, the court held, "In addition to a showing of exculpatory quality the cases have required a demonstration of the existence of the evidence at the time of the trial or the intentional failure of the prosecution to preserve and produce the evidence."

In the instant case, the record does not support a finding that defendant was denied a fair trial by the State's inability to maintain the quality of the specimens. Kathy Moorman, a microanalyst for the police crime laboratory, testified that the State attempted to preserve the specimens in a "fluid sealed plastic tube" which was the customary method used by the crime laboratory. She stated that due to the large number of rape cases, this type of evidence is not "examined" until it is certain that the case is going to court.

In our opinion, there has been no showing that the State *intentionally* failed to preserve or to produce this evidence. We believe there was ample evidence to support the jury's assessment of defendant's guilt.

For the foregoing reasons, we affirm in part; we vacate the three sentences which did not result from "a judgment or conviction by the jury."

Affirmed in part; vacated in part.

HARTMAN, P.J., and DOWNING, J., concur.