THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MELVIN TISDEL, Defendant-Appellant.

First District (5th Division)    No. 1—98—0393

Opinion filed September 29, 2000.

QUINN, P.J., specially concurring.

Rita A. Fry, Public Defender, of Chicago (Ira Sheffey, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Eileen M. O'Neill, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

A jury convicted defendant of first degree murder. The State's evidence consisted of four eyewitnesses who identified defendant as the shooter in a drive-by shooting. The trial court sentenced him to 35 years in prison. Defendant now appeals, arguing that the trial court erred in (1) refusing to allow expert testimony regarding eyewitness identification; (2) admitting nonidentification lineup testimony; (3) admitting testimony regarding the identification of his codefendant; and (4) allowing lineup photographs to go back to the jury. Defendant also argues that he received ineffective assistance of counsel based on his trial counsel's failure to object to the nonidentification testimony and testimony regarding his codefendant.

On August 19, 1996, three eyewitnesses identified defendant from a lineup as the passenger who shot Julio Lagunas in a September 3, 1995, drive-by shooting. He was arrested and charged with first degree murder. The driver of the car, Mark Robinson, had already been arrested and charged in connection with the crime.[1] On September 12, 1997, a fourth eyewitness picked defendant out of a lineup as the shooter. Defendant filed motions *in limine* to quash his arrest and suppress the lineup identifications. The trial court denied the motions.

Defendant also filed a motion *in limine* to allow expert testimony on eyewitness identification. Defense counsel asserted that Dr. Elizabeth Loftus would testify regarding the scientific bases for eyewitness identification and identify certain areas where jurors hold misconceptions about the identification process. Defendant's written offer of proof alleged that Dr. Loftus would discuss several factors beyond the knowledge of the average lay person that affect a witness' ability to recall. Specifically, she would have testified about the latest scientific research concerning the passage of time between the incident and the identification; the lack of correlation between the certainty with which a witness makes an identification and the validity of that identification; the effect of stress on a witness; weapon focus; and cross-racial identification. Although the trial court found Dr. Loftus' curriculum vitae to be "extremely impressive," it determined that her testimony would not ordinarily be beyond the normal knowledge of the average person and in this case would be more confusing than it would be

---

[1]The record establishes that Robinson's trial took place before commencement of defendant's trial.

helpful; however, it did not deny the motion because such testimony might not, in the appropriate case, be proper. Consequently, the trial court denied the motion.

At trial, the State called Gerardo Quiroz. Gerardo testified that on September 3, 1995, he was standing on the sidewalk outside Clark Mall. His friend Jose Ramos was making a call on a pay phone at the mall entrance. The parking lot was next to the entrance of the mall. Gerardo's brother, Osvaldo, was standing near Jose. Gerardo observed a car heading south on Clark Street. The car was a black IROC Camaro with tinted windows, chrome wheels, and two tailpipes. The side windows of the car were down. The car pulled into the mall entrance and stopped near the phones. The two men inside the car attempted to talk to some girls who were heading toward the mall entrance. After the girls entered the mall, the car drove toward the back of the parking lot, turned right, and came through the middle of the lot. The car stopped on the sidewalk before turning left into Clark Street. At this point, Gerardo was closer to Jose, and the car was approximately 30 to 40 feet from them when Gerardo saw the passenger pull out a gun and point it at them. Gerardo testified that he tried to hide behind a nearby brick pillar but was able to focus on the face of the passenger. Gerardo identified defendant as the passenger.

Gerardo saw Francisco Curonel standing across the street in front of Touhy Park as Gerardo and Jose followed the car on the Touhy Park (east) side of the street. Osvaldo remained on the mall side of the street. Francisco attempted to "hit" the car with something but missed. The passenger took out the gun and pointed it at Francisco, who ducked. The car continued along Clark Street and went through the Jarvis, Clark and Rogers intersection. Osvaldo crossed the street from the mall side. Gerardo saw Julio Lagunas and Ulysses Renteria, who died before the trial started, trying to cross Clark Street from the Touhy Park side of the street. The car stopped, and Gerardo "saw a hand sticking out" from the passenger side of the car. At this point, Gerardo was at the Jarvis intersection north of the mall. There was a gun in the passenger's hand, and it was pointed toward Julio and Ulysses when Gerardo heard a gunshot. The car then sped up and "took off north." Gerardo ran up to Julio and Ulysses. Jose was already there, and Osvaldo arrived immediately thereafter. Osvaldo went home before the police arrived. Gerardo, Jose, Francisco, and Ulysses described the car to the police and were taken to the 24th District police station, where they viewed the car.

Gerardo testified that he was then taken to Belmont and Western station to talk to detectives. Gerardo described the passenger as a 23-year-old skinny black male with braided hair and a light complexion.

He viewed a lineup but was unable to identify anyone. On August 16, 1996, Gerardo viewed another lineup and recognized the second person from the left as the passenger, whom he identified as the defendant, and he also identified People's exhibit 14 as a picture of the lineup, placing an "X" over the passenger's head.

During cross-examination, when defense counsel asked Gerardo if he was initially 30 to 40 feet away from Jose and Osvaldo, he answered "no." Defense counsel attempted to impeach him with testimony he apparently gave during Robinson's trial. Gerardo did not remember testifying that Jose and Osvaldo were 30 to 40 feet away from him. The parties stipulated that on July 10, 1997, Gerardo testified that he was on the sidewalk on the side of the mall and that Osvaldo and Jose were 30 or 40 feet away from him. Gerardo explained that when the car first pulled into the lot, he saw two black males but couldn't tell what they looked like at that point. Gerardo moved over to the phones. The car made its way around the parking lot and stopped before turning onto Clark Street. He saw the passenger pull out the gun. He denied feeling fearful, stressed, or nervous. The car turned left and went north on Clark. Gerardo stated that he "hung back a bit" as he followed the car.

Gerardo admitted that he talked with the others about what they saw when they went to view the first lineup at Belmont and Western. He did not remember talking to Osvaldo and Francisco when he viewed the lineup a year later nor did he remember what the passenger was wearing, but he did remember that the passenger had braids close to his head with beads on the end. He told the police at the scene about the braids.

The State called Osvaldo Quiroz next. Osvaldo testified that he was standing near the pay phones with Jose. Gerardo was standing about 20 feet to the south on the sidewalk. A car came through the driveway of the parking lot and stopped right at the phones. It was a black IROC Camaro with chrome pipes, chrome rims, and tinted windows. The windows were down and he could see two black people inside the car. He saw them talk to "two or three" girls. Osvaldo was about 20 feet from the car and could see inside the vehicle. The driver's side was closest to him. He described the driver as having dark skin, short hair, and a thin mustache. The car drove to the back of the lot, came up through the middle aisle, and stopped. At that point, the passenger's side was closest to Osvaldo, who was standing approximately 40 feet away. He described the passenger as a dark male who had long braided hair with black, white, and blue beads at the end of the hair. The passenger pulled out a gun and pointed it in Osvaldo's direction. The others hid behind a brick pole. The car then turned left out of the lot. Osvaldo identified defendant as the passenger.

Osvaldo saw Francisco standing beside the sidewalk across the street near Touhy Park. Osvaldo testified that he yelled "watch out for the car" to Francisco. Francisco started running north on Clark on the Touhy Park side of the street. Gerardo started running north on Clark on the mall side of the street. The car stopped for "a little while" at the light at Jarvis, then took off. The car stopped again, and he heard a shot. At this point, Osvaldo was about half a block away and crossing from the mall side of the street to the Touhy Park side. The car sped off north on Clark. The following day, Osvaldo saw the shooter in a green Nissan Maxima. The shooter stared at him and then lay back on the seat.

On September 12, 1995, Osvaldo spoke with the police at Belmont and Western and looked at some pictures. He identified the driver from a photograph the police showed him. Osvaldo told them he was "pretty sure that was the guy but he needed to see him in person." Osvaldo went back to the station on September 21, 1995, to view a lineup. Gerardo was there too, but Osvaldo did not talk to Gerardo before viewing the lineup. He identified Robinson as the driver. There was a person in the lineup who had corn rows or braids in his hair, but it was not defendant. On August 16, 1996, Osvaldo saw another lineup. Ulysses, Gerardo, Jose, and Francisco were also there but Osvaldo did not talk with them before viewing the lineup. Osvaldo identified People's exhibit 17 as a picture of the lineup and identified defendant as the person he identified. Osvaldo put an "X" over defendant's head.

During cross-examination, Osvaldo stated that he did not hear what Jose said while he was on the phone. Gerardo was about 20 feet away from him. Defense counsel tried to impeach him with testimony he gave during Robinson's grand jury, but Osvaldo did not remember saying Gerardo was 30 to 40 feet away from him. The parties later stipulated that on August 22, 1996, Osvaldo testified that Gerardo was 30 or 40 feet away from him. Defense counsel then tried to impeach Osvaldo with testimony he gave during defendant's grand jury. When asked if he said the car stopped for about a second by the pay phones, he said that was not correct. He did not remember saying that the car "just pulled off" after the occupants talked to the girls. The parties later stipulated that on July 10, 1997, Osvaldo testified that "the car stopped by the phone for about a second, they talked to some girls, then pulled off." Before the car left, the driver's side was closest to him. The car then pulled around to the back of the lot, turned, and stopped again before turning left onto Clark. He hid when he saw the passenger display a gun. Osvaldo described what the gun looked like.

Osvaldo stayed back at the mall. Gerardo and Jose crossed to the

Touhy Park side. Osvaldo saw Francisco running north on the Touhy Park side of the street. The car stopped at the red light at the next intersection, then ran it. Defense counsel attempted to impeach Osvaldo with testimony he gave during Robinson's trial. He recalled being asked if the car went through the red light and answering "yes." Osvaldo stated that he viewed the August 16, 1996, lineup separately from the other witnesses and did not talk about the crime with them on the way to the station. Defense counsel asked Osvaldo if he thought he saw the passenger the next day. Osvaldo answered "I didn't think—I saw him."

The State called Francisco Curonel next, who testified that he was by himself near Touhy Park, which is the on east side of Clark. He saw a dark grey IROC Z car drive slowly down Clark heading south. The car had "nice rims," tinted windows, and chrome pipes. The driver's window was down. The driver was black and had short hair, a bald head, a goatee, and was wearing a black T-shirt. The car turned into Clark Mall, which was approximately 15 feet away from where he was standing. After the car turned into the mall parking lot, he "hear[d] some voices that was saying, 'watch out with the car, they've got a gun.' " He saw Jose, Gerardo, and Osvaldo by the pay phones. The car pulled out from the middle of the parking lot and turned north on Clark. The passenger threw his arm out and pointed a gun at him. Francisco threw a bag at the car and then fell to the ground. The passenger was about 10 or 7 feet away from him. He identified defendant as the passenger. Francisco got up and started running toward Julio and Ulysses, who were approximately 100 feet away. He yelled "watch out with the car, they got a gun." The car stopped at the light for a "couple of seconds," then sped up. The car slowed when the occupants saw Julio and Ulysses. The passenger put his arm out of the window with a gun in his hand. Francisco was about five feet away from the car when the shot went off.

The police took him, Ulysses, Jose, and Gerardo to the 24th District, where he saw the car. The police then took them to Belmont and Western to view a lineup. Francisco was "90 percent sure" he saw the driver. He described the passenger as a black male, about 25 to 28, with a skinny face and braided hair close to his head. Francisco went back to Belmont and Western on August 16, 1996, to view another lineup. He identified People's exhibit 26 as a picture of the lineup. He identified the shooter and put an "X" over the head of that person. Francisco testified that he saw the lineup by himself and did not have a chance to talk with Gerardo or Osvaldo after viewing it.

During cross-examination, Francisco stated that when the car first passed him heading south on Clark Street, the driver's window was

down and he could see the driver and the passenger. Defense counsel attempted to impeach him with testimony he gave during Robinson's trial. Although Francisco did not recall being asked if he was able to see the passenger of the car, he did recall answering "not at that time." Francisco explained that he saw two people in the car but that he couldn't see what the passenger looked like at that time.

On redirect, he testified that he saw the face of the person pointing the gun at him and identified defendant as that person. On recross, he stated that the car was driving slowly as it passed him the second time.

The State then called Jose Ramos, who testified that he was on the pay phone. Gerardo and Osvaldo "[were] right next to [him]." A black IROC Camaro stopped right in front of him on the sidewalk. The car had a tinted back window, chrome rims, and two chrome tailpipes. The car was about 5 to 10 feet away from him. The windows were down, and he could see two males. The passenger was smoking marijuana, and there was a gun between the seats. The passenger grabbed the gun and put it between his legs. The passenger had braids. He identified defendant as the passenger. The car "took off," and he hung up the phone. The car went around the lot and came out the middle. Before turning left onto Clark, defendant pointed the gun at him. Jose saw Francisco across the street. Francisco tried to throw something at the car and then hit the ground when defendant pointed the gun at him. Jose ran across the street to Francisco. The car went through a red light. Jose saw Julio trying to cross the street. The car pulled up to the sidewalk right next to Julio. A shot came from the passenger side of the car, after which the car kept going. Jose and Francisco ran up to where Julio was lying. Osvaldo and Gerardo were there too. After giving a description of the car to the police, they were taken to the 24th District. Jose saw the car in the parking lot in back of the station. The police then took them to Belmont and Western. Jose described the passenger as 21 to 25 years old, dark skinned, with braids. He looked at a lineup that night but was unable to identify anyone. On September 12, 1997, Jose saw another lineup and identified defendant as the passenger. Jose identified People's exhibit 30 as a picture of the lineup and put an "X" over the person he identified.

During cross-examination, Jose stated that he saw three girls go into the mall, although he could not remember how many girls he told the police he saw. He saw the gun after the girls had already passed by. Jose turned his back to the car and hung up the phone. The parties later stipulated that on July 11, 1997, Jose was asked if he saw the gun just before the car pulled off and that Jose replied "No. I see the gun. They was talking to the girls." The car went to the back of the

lot, made a couple of right turns, and stopped. The passenger pulled out the gun and pointed it at him, Osvaldo, and Gerardo. When he saw the gun, he ran across the street. Gerardo also crossed the street, but he could not remember what Osvaldo did. Jose followed the car but hung back a bit. The car did not stop at the red light, but made a "quick stop" and pulled close to the sidewalk where Julio and Ulysses were. Jose did not see any ornaments or beads in the passenger's braids. He and his friends talked to the police in different rooms at the police station. He acknowledged that when they were not talking to the police, they were together. Jose did not identify anyone in the lineup that night. Jose admitted that he did not identify the driver during Robinson's trial or any other time. On September 12, 1997, he was asked to view another lineup. The room where the lineup took place was not lit up like in the photo. He waited until all eight men stepped forward and turned around before identifying "#4" as the passenger.

Officer Gaskew testified that he obtained a description of the car from the witnesses at the scene. The witnesses told him the passenger was wearing dark clothing and had braids or corn rows in his hair. Their description did not include beads in the passenger's hair.

Officer Floyd Eppling testified that he was driving a squad car when he received a message about a vehicle wanted in connection with a shooting. Officer Eppling saw a car that matched the description. The driver's window was down part way, and he saw two black people in front. The passenger had either braids or waves with multicolored beads. He could not tell if the person was male or female. There was too much traffic to make an immediate U-turn, but he eventually caught up to the car and pulled it over; however, the passenger was no longer in the car. He brought the driver to the 24th District and his partner drove the car to the station. The crime scene was about 2½ miles from where he pulled the car over.

During cross-examination, Officer Eppling stated that he saw the car about five minutes after receiving the message. The passenger's braids were about shoulder length, hanging, with multicolored beads. He could not see the passenger's face. He did not see the passenger leave the car, but stated "[i]t had to be on the 5800 block of Sheridan" after the car passed the squad car.

Detective Greg Pattitsis interviewed Francisco at the 24th District. Francisco tentatively identified Robinson as the driver. Francisco said "it looked like the individual that was driving the car, but he wasn't sure." Gerardo and Jose did not identify anyone. He also interviewed Osvaldo a few days later. Osvaldo described the passenger as 23 to 28 years old, dark complected, with braided hair and curls or strands in

the back with black, white, and blue beads. Osvaldo picked Robinson out of a photo array as the driver but asked to see him in person. Osvaldo picked Robinson out of a lineup as the driver.

On August 16, 1996, defendant was brought to Area 3. Gerardo, ·Osvaldo, and Francisco came to the station and viewed a lineup. They identified defendant as the passenger. Detective Pattitsis identified People's exhibit 41 as an individual picture of defendant taken from the lineup. Defendant was 21 years old at the time, 5 feet 9 inches, 155 pounds, and had a braided hairstyle. He gave two addresses, one of which was about five blocks from the crime scene. On September 12, 1997, Jose viewed a lineup at the county jail. Jose identified defendant as the passenger. Detective Pattitsis identified People's exhibit 42 as an individual picture of defendant taken from the lineup. Defendant had a different hairstyle than the one he had in August.

During cross-examination, defense counsel asked Detective Pattitsis if Osvaldo told him that the passenger had long black hanging braids with white, black, and blue beads on the end. Detective Pattitsis replied "No. Not totally correct." Defense counsel attempted to impeach him with his handwritten notes from his interview with Osvaldo. When asked if the police report and his notes indicated that Osvaldo gave that description of the passenger, Detective Pattitsis replied "Yes." Detective Pattitsis admitted that defendant was the only person in the first lineup whose hair was in corn rows or braids close to his head. The photograph of the second lineup defendant participated in was taken outside because the lighting conditions at the county jail were bad.

Officer Robert Labbe testified that he interviewed Jose, who described the passenger as a black male with a dark complexion and black hair with corn rows. Officer Labbe was not present when the September 3, 1995, lineup was conducted. He interviewed Osvaldo on September 12, 1995, and showed him a group of photographs. Osvaldo picked the photograph of Robinson and said he was "pretty sure that was the person that was driving the vehicle at the shooting," but that he wanted to see him in person. When Osvaldo viewed a lineup on September 21, 1995, he picked Robinson as the driver. During cross-examination, Officer Labbe acknowledged that his police report said nothing about the girls crossing in front of the car.

Detective Stephen Schorsch identified a photograph of defendant taken on August 16, 1996. Defendant's hair was in braids. Detective Schorsch also identified a photograph of defendant taken on September 12, 1997. His hair was no longer in braids and was short. The light at the viewing window in the September lineup allowed the witness to see the face of each person.

During cross-examination, Detective Schorsch admitted that he had complained about the lighting conditions during the second lineup but was told they could not be improved. On redirect, he testified that he could see the participants before they stepped up to the viewing window.

Defendant's motion for a directed finding was denied.

The defense first called Patrick Moran, the forensic investigator who lifted fingerprints from the car.

The defense next called Richard McGrath, an expert in latent fingerprint identification. He examined the latent fingerprints recovered from the car. Only two were suitable for comparison with fingerprints in the automated fingerprint identification system. There were no positive comparisons. He was asked to compare the latent prints to fingerprints of Robinson and defendant. Robinson's matched, but defendant's did not. On cross-examination, he testified that fingerprints are not necessarily left behind every time a person touches a surface and that it cannot be determined how long a fingerprint has been in a particular place.

The trial court's instruction to the jury included the following:

> "When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence including but not limited to the following: The opportunity the witness had to view the offender at the time of the offense or the witness' degree of attention at the time of the offense; or the witness' earlier description of the offender; or the level of certainty shown by the witness when confronting the defendant; or the length of time between the offense and the identification confrontation."

The trial court allowed the lineup photographs to go back with the jury over defense counsel's objection.

The jury found defendant guilty of first degree murder.

On November 21, 1997, defendant filed a motion for a new trial or judgment notwithstanding the verdict. At the hearing, defense counsel argued that the defense should have been allowed to present expert testimony concerning eyewitness identification. Before ruling, the trial judge stated that he "would have weighed the evidence differently *** and that he was not personally convinced based on the evidence that defendant was proven guilty beyond a reasonable doubt." However, the trial court denied the motion, finding that there was a rational basis to find defendant guilty.

The trial court sentenced defendant to 35 years' imprisonment.

Defendant argues that he is entitled to a new trial because the State impermissibly attempted to bolster its case by having Gerardo, Osvaldo, and Jose testify that, prior to viewing the lineup from which

they identified defendant, they viewed another lineup from which they did not identify anyone as being the passenger. Defendant was not in this initial lineup. Defendant concedes that he has waived this issue for review since he did not object to the testimony at trial or in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176 (1988). However, defendant urges us to apply the plain error rule. The plain error doctrine (134 Ill. 2d R. 615(a)) may be applied where the evidence is closely balanced or where the error is of such magnitude that it denied the accused a fair trial. *People v. Ward*, 154 Ill. 2d 272 (1992). The State maintains that the evidence is overwhelming since four eyewitnesses identified defendant as the shooter.

■ Unless vague or doubtful, eyewitness identification of an accused will sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. *People v. Lewis*, 165 Ill. 2d 305 (1995). Factors to consider in determining whether an identification is reliable are: (1) the opportunity the witness had to view the offender at the time of the offense; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the offender; (4) the level of certainty demonstrated by the witness at the identification confrontation; and (5) the length of time between the incident and the identification confrontation. *Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972); *People v. Homes*, 274 Ill. App. 3d 612 (1995). A reviewing court cannot substitute its own judgment for that of the trier of fact on questions involving the credibility of witnesses or the weight of the evidence. *Homes*, 274 Ill. App. 3d at 621.

In *Homes*, the defendant was charged with several offenses that arose out of a drive-by shooting. Two eyewitnesses positively identified the defendant as the shooter from a lineup. The first witness testified that he was 30 feet away from the defendant's car when he saw the defendant point a gun toward some pay phones and fire four shots. The second witness, who was the intended victim, testified that he was speaking on one of the pay phones when he saw a car stop at a nearby corner. He saw the defendant fire two shots, get out of the car and fire two more shots. The trial court found defendant guilty. The appellate court, in affirming, held that the State proved the defendant guilty beyond a reasonable doubt. The court noted that the shooting took place during the daylight; both witnesses knew the defendant; both had ample opportunity to view the shooter; and both gave good, consistent descriptions of the car and the gun.

Unlike *Homes*, none of the eyewitnesses knew defendant or viewed him for a considerable length of time. There was no physical evidence linking defendant to the crime, and defendant was not arrested near

the scene. See *People v. Lewis*, 243 Ill. App. 3d 618 (1993). Defendant did not confess, and Robinson did not testify. See *People v. Harris*, 182 Ill. 2d 114 (1998). Although all four eyewitnesses independently identified defendant in lineups and in court, we cannot ignore the substantial amount of time that elapsed between the offense and the lineup identifications. Osvaldo, Gerardo, and Francisco picked defendant out of a lineup almost a year after the shooting. Jose picked defendant out of a lineup two years later. Although Osvaldo and Jose had the best opportunity to view the passenger, the driver was in their line of sight when the car was closest to them. Therefore, we agree with defendant that the evidence was closely balanced.

■ The State may not bolster a witness' identification of a defendant by introducing evidence that the witness failed to identify anyone else during pretrial identification procedures. *People v. Hayes*, 139 Ill. 2d 89 (1990). Witnesses cannot testify as to statements made out of court in an effort to corroborate their trial testimony on the same subject. *People v. Biggers*, 273 Ill. App. 3d 116 (1995). Here, defendant complains that the prosecutor relied on the nonidentifications to show how careful the witnesses were in their identifications of defendant. Gerardo and Jose testified that they viewed a lineup on September 3, 1995, but were unable to identify anyone. Osvaldo testified that he viewed a lineup on September 21, 1995, from which he identified the driver but not the passenger. The record establishes that the prosecutor relied on this testimony during closing argument. It is clear that the nonidentification testimony should not have been allowed because it was presented simply to corroborate the witnesses' subsequent identification of defendant. However, the error cannot be considered harmless. The cases the State relies on are inapplicable. In *People v. Berry*, 264 Ill. App. 3d 773 (1994), the victim testified that she failed to identify anyone in a lineup less than a week after the robbery but that she identified the defendant as soon as she saw him in a second lineup one month later. The court held that the error was harmless in light of the overwhelming evidence against the defendant. In *People v. Jones*, 153 Ill. 2d 155 (1992), the court held that while the evidence against the defendant was not overwhelming, it was not so close that the trial court's error in admitting the robbery victim's nonidentification testimony, standing alone, required reversal. However, the victim was able to view the defendant as he approached her car, when she turned to hand him her purse, and while she was in the car with him. In contrast to *Berry* and *Jones*, the evidence in the instant case was closely balanced. It is quite possible that the jury would have returned a different verdict had the nonidentification testimony been excluded. Therefore, the trial court's error in admitting the testimony warrants

reversal under *Hayes*. The holding in *Hayes* is clear, and as an intermediate reviewing court, we are bound to follow its mandate; however, it is difficult to imagine that this is the issue upon which the jury determined the credibility of the witnesses.

We agree with defendant that his trial attorney should have objected to the nonidentification testimony and raised the issue in the posttrial motion. However, defendant's ineffective assistance argument is immaterial, given our consideration of the issue under the plain error doctrine.

We now consider an issue likely to arise on remand. Defendant argues that the trial court erred by denying his motion *in limine* to admit the expert testimony of Dr. Loftus on the subject of eyewitness identification. The State argues that the trial court correctly denied defendant's request because the reliability of eyewitness identifications is not beyond the common knowledge of the average juror.

■ In Illinois, expert testimony is generally allowed if (1) the testimony reflects generally accepted scientific or technical principles; (2) the expert's experience and qualifications afford him knowledge that is not common to lay persons; and (3) the testimony will aid the trier of fact in reaching its conclusion. *People v. Enis*, 139 Ill. 2d 264 (1990); *People v. Cloutier*, 156 Ill. 2d 483 (1993). The admission of eyewitness identification expert testimony is within the sound discretion of the trial court and its ruling should not be reversed absent a clear showing of abuse of that discretion. *Enis*, 139 Ill. 2d at 289-90. In *Enis*, the trial court granted the State's motion *in limine* to preclude expert testimony regarding the reliability of eyewitness testimony. In an offer of proof, the defense claimed that the expert would testify that the relationship between confidence and accuracy is insignificant; that the higher the stress level the less accurate the memory; that the identification is usually worse when a weapon is present; and that jurors give too much weight to time estimates. The trial court held that the testimony would amount only to speculation. The defendant was convicted of first degree murder. Although the Illinois Supreme Court reversed and remanded on another issue, it found that the trial court did not abuse its discretion because the testimony would not have aided the jury in reaching its conclusion. *Enis*, 139 Ill. 2d at 288. Specifically, the court noted that none of the eyewitnesses was in a high stress situation; that only one witness testified that he saw a weapon; and that testimony regarding time or estimates was not relevant. The court also noted that while witness confidence may have been present, that factor alone did not require a new trial. The court expressed its concern with the reliability of eyewitness expert testimony and cautioned that a trial court must exercise discretion

and consider both the necessity and relevance of expert testimony in a particular case.

■ Illinois courts have uniformly upheld a trial court's refusal to allow such testimony. For example, in *People v. Dixon*, 87 Ill. App. 3d 814 (1980), the court held that the trial court properly excluded expert testimony concerning unreliability of cross-racial identifications, reasoning that the trustworthiness of eyewitness observations is not generally beyond the common knowledge and experience of the average juror. See also *People v. Johnson*, 97 Ill. App. 3d 1055 (1981) (same). *People v. Perruquet*, 118 Ill. App. 3d 339 (1983), held that the trial court properly excluded expert testimony regarding the effect of stress upon a victim's recall of events where a weapon is used. In *People v. Brown*, 100 Ill. App. 3d 57 (1981), the court held that factors such as stress, opportunity to observe, distortion of memory, and problems of cross-racial identification are within the realm of common experience and can be evaluated by the jury without expert assistance. *Brown*, 100 Ill. App. 3d at 72. Similarly, in *People v. Clark*, 124 Ill. App. 3d 14 (1984), the trial court granted the State's pretrial motion to exclude expert testimony on eyewitness identification. In the offer of proof, defense counsel stated that the expert would testify about several factors that affect the reliability of eyewitness identification, including stress, witness confidence, and weapon focus. The appellate court held that the trial court did not err in excluding the testimony since these factors are within the province of the jury. *Clark*, 124 Ill. App. 3d at 22-23. See also *People v. Biggers*, 273 Ill. App. 3d 116 (1995). We note that the Seventh Circuit disfavors expert testimony on the reliability of eyewitness identification. See, *e.g., United States v. Hall*, 165 F.3d 1095 (7th Cir. 1999).

Again, we note that the court here has properly weighed the benefits of such testimony and has exercised its discretion in not allowing the expert to testify, rather than ruling outright that such testimony can never be probative.

Other jurisdictions have found that the exclusion of expert testimony regarding eyewitness identification is an abuse of discretion. In *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983), the court held that the trial court abused its discretion by excluding expert testimony based on the unusual facts of the case. *Chapple* involved a murder by a person whom the witnesses had never met before and did not identify until 13 months later. In the interim, the witnesses were shown many other photographs, including one of the defendant which they did not identify. They also picked out another person as resembling one of the gunmen; that person was an acquaintance of both one of the perpetrators and one of the victims. The court found

that the proffered expert testimony was limited to general factors relevant to the reliability of eyewitness identification which would have been applicable to the facts. See also *Skamarocius v. State*, 731 P.2d 63 (Alaska App. 1987) (finding that the trial court abused its discretion in excluding expert testimony where identity was central to the case and the victim could not positively identify the defendant); *People v. Campbell*, 847 P.2d 228 (Colo. App. 1992) (finding the exclusion of expert testimony to be reversible error where there was no corroborating evidence and the testimony "fit" the evidence).

Numerous studies in the area of eyewitness psychology indicate that there is significant potential for eyewitness error and that jurors have misconceptions about the abilities of eyewitnesses. See 19 Am. Jur. Proof of Facts 2d *Pretrial Identification* 435 (1979 & Supp. 2000). There are two types of eyewitness identification expert testimony. The first dispels myths or attacks commonsense misconceptions about eyewitness identifications, such as the effects of stress and weapon focus on the accuracy of identifications. The second provides the jury with useful information about the kinds of mental factors involved in the identification process, such as the effect of time on the reliability of identifications, the forgetting curve, and problems with cross-racial identifications. W. Wolfson, "That's the Man!" Well, Maybe Not: The Case for Eyewitness Identification Expert Testimony, 26 Litig. 5, 6 (2000). Trial courts should carefully scrutinize the proffered testimony to determine its relevance—that is, whether there is a logical connection between the testimony and the facts of the case. Normally, expert testimony that is probative and relevant should be allowed. *People v. Sargeant*, 292 Ill. App. 3d 508 (1997). The trial court must also determine whether the proffered testimony would confuse or mislead the jury. We realize that other jurisdictions have formulated guidelines for trial courts to follow when considering whether to allow such testimony. See, *e.g., State v. Moon*, 45 Wash. App. 692, 726 P.2d 1263 (1986) (listing as factors the identification of the defendant is the principal issue at trial; the presentation of an alibi defense; and little or no other evidence linking the defendant to the crime). However, a trial court's decision to allow or exclude eyewitness identification expert testimony must be made on a case-by-case basis. Even where cross-examination of an eyewitness and an instruction are sufficient, allowing expert testimony may still be helpful to the trier of fact.

Defendant contends that Dr. Loftus' testimony should have been admitted because it would have aided the jury in reaching a more informed decision as to the credibility of the eyewitness testimony. We find that the trial court properly exercised its discretion under *Enis*. The record shows that the judge considered the reliability and

potential helpfulness of the testimony, balanced the proffered testimony against cases in which this court has upheld the exclusion of such evidence, and found that the testimony would not assist the jury. See *Hall*, 165 F.3d at 1106. Additionally, the record establishes that defense counsel thoroughly cross-examined all of the eyewitnesses and that the trial court instructed the jury on the reliability of eyewitness identification. However, the trial court would not have abused its discretion had it allowed the testimony given the facts of this case.

Under certain circumstances, eyewitness identification expert testimony can assist the jury in reaching a correct decision. This is such a case. The central issue at trial involved the accuracy of the eyewitness identifications. The circumstances surrounding those identifications are questionable. See *People v. Brown*, 110 Ill. App. 3d 1125 (1982) (finding that the trial court did not err in allowing, but then rejecting, expert testimony regarding the effect of stress on memory where the majority of factors indicated a reliable identification). Most troubling is the significant amount of time that elapsed between the crime and the identifications. There was no corroborating evidence linking defendant to the crime. Dr. Loftus' testimony would have been relevant because she would have discussed the factors that affected the reliability of the identifications in the instant case without directly commenting on the eyewitnesses' credibility.

We acknowledge that the use of expert testimony could lead to battles between experts over the value of eyewitness identifications. However, "[g]iven the high stakes in criminal cases and the proven ability of judges to tailor issues and limit witnesses, a little extra time does not seem wasteful even if expert witnesses are competing for the jury's attention." W. Wolfson, "That's the Man!" Well, Maybe Not: The Case for Eyewitness Identification Expert Testimony, 26 Litig. 5, 8 (2000). As the Illinois Supreme Court noted in *People v. Gardner*, 35 Ill. 2d 564, 572 (1966), "[o]f all the factors that account for the conviction of the innocent, the fallibility of eye-witness identification ranks at the top."

We decline to address defendant's remaining arguments.

Reversed and remanded for a new trial.

THEIS, J., concurs.

PRESIDING JUSTICE QUINN, specially concurring:

I agree completely with the holding and the analysis of the majority as to all issues in this case. I write separately to express my strong

disagreement with our supreme court's position that "nonidentification" testimony is inadmissible.

The United States Supreme Court addressed the issue of nonidentification testimony in the landmark case of *United States v. Wade*, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967). The Supreme Court held that testimony regarding nonidentification is properly a factor to consider when determining whether an identification at a lineup has an independent basis for admissibility even though the defendant's right to have counsel present was violated:

> "Application of this test in the present context requires consideration of various factors; for example, the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, *any identification prior to lineup of another person*, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification." (Emphasis added.) *Wade*, 388 U.S. at 241, 18 L. Ed. 2d at 1165, 87 S. Ct. at 1940.

In *People v. Hayes*, 139 Ill. 2d 89, 137-38 (1990), our supreme court held that testimony that eyewitnesses to a crime had not identified the defendant from mug books and photo arrays was not admissible at trial. Their reasoning was that testimony on this issue did not involve identification. The court cited *People v. Hayes*, 168 Ill. App. 3d 816 (1988), and *People v. Trass*, 136 Ill. App. 3d 455 (1985), as support for this holding.

However, the appellate court in the *Hayes* case did not hold that admitting evidence that the eyewitnesses had looked through many police photo books without identifying the defendant was error. The court merely recited that the defense cited the holding in *Trass* and then held that the nonidentification testimony was harmless. *Hayes*, 168 Ill. App. 3d at 820.

In *Trass*, a detective testified that one of the eyewitnesses had toured the area of the crime and picked out two possible suspects. The detective testified that those two persons were put in a lineup. The eyewitness did not identify either of the two suspects he had pointed out earlier but did identify one of the defendant's codefendants. This court held: "[T]he State argues that evidence of a prior positive identification of the defendant is admissible and thus suggests that a prior consistent nonidentification of another suspect should also be admissible. We do not find the State's argument to be persuasive. A prior identification of the defendant is admissible because it refutes the possibility that an in-court identification is based solely on the

suggestiveness of the trial setting. (*People v. Rogers* (1980), 81 Ill. 2d 571, 411 N.E.2d 223.) Evidence that a witness previously did not identify someone other than the defendant is not relevant for that same purpose and, therefore, is not admissible on that ground." *Trass*, 136 Ill. App. 3d at 464.

There is nothing in the *Trass* opinion that suggests the prosecutor at trial was offering the detective's testimony to rebut a defense argument that the in-court identification was suggestive. Indeed, there is nothing in the *Trass* opinion that the testimony was offered for any purpose. The most reasonable explanation for the State's action in calling the detective was to "front" the misidentification of the two people on the street. The fact that the witness had misidentified two persons on the street within minutes of the home invasion could certainly have been raised by the defense to attack the witness' testimony regarding any other identification. Fronting the misidentification would have restricted the amount of damage caused to the State's case. On appeal, the State posited a reason for the trial prosecutor's actions that did not appear to have any basis in fact. The appellate court correctly rejected this rationale.

It is obviously true that evidence that a witness previously did not identify someone other than the defendant is not relevant as to the suggestiveness of the in-court identification. However, the fact that a witness looked at dozens or hundreds of photographs or multiple lineups does refute the possibility that the prior identification of the defendant during the investigation was based on the suggestiveness of that pretrial identification procedure. The appellate court in *Trass* never considered this as a basis for the admissibility of the initial misidentification and subsequent nonidentification.

In *People v. Jones*, 153 Ill. 2d 155 (1992), the victim was allowed by the trial court to testify regarding a lineup at which he made no identification. The appellate court held that this was error. The supreme court said, "The State argues that this testimony was necessary to counter the defense's allegation that the lineup was overly suggestive and that the identification was therefore not trustworthy. This is simply a fancy way to argue that it was necessary to corroborate Wallace's testimony, which is precisely what *Hayes* disallows." *Jones*, 153 Ill. 2d at 162. As just pointed out, *Hayes* is entirely reliant on *Trass* and the court in *Trass* did not consider whether nonidentification testimony is admissible to refute the notion that the pretrial identification was suggestive.

The significant role pretrial identifications play at trial has been well recognized by our courts. In *United States v. Owens*, 484 U.S. 554, 98 L. Ed. 2d 951, 108 S. Ct. 838 (1988), the Supreme Court considered

Federal Rule of Evidence 801(d)(1)(C), which is very similar to our section 115—12 on allowing admission of pretrial identifications. There, the Court held that the victim's out-of-court identification was admissible as nonhearsay where the victim was present and available for cross-examination concerning the identification even though the witness had suffered brain damage and had no memory at trial of who had attacked him. The Court pointed out: "The premise for Rule 801(d)(1)(C) was that, given adequate safeguards against suggestiveness, out-of-court identifications were generally preferable to courtroom identifications. Advisory Committee's Notes on Rule 801, 28 U.S.C. App., p. 717." *Owens*, 484 U.S. at 562, 98 L. Ed. 2d at 960, 108 S. Ct. at 844.

In *People v. Panczko*, 86 Ill. App. 3d 409, 411 (1980), this court cited with approval language from *People v. Gould*, 54 Cal. 2d 621, 626, 354 P.2d 865, 867, 7 Cal. Rptr. 273, 275 (1960), *overruled on other grounds by People v. Cuevas*, 12 Cal. 4th 252, 906 P.2d 1290, 48 Cal. Rptr. 2d 135 (1995): "Unlike other testimony that cannot be corroborated by proof of prior consistent statements unless it is first impeached [citations], evidence of an extrajudicial identification is admitted regardless of whether the testimonial identification is impeached, because the earlier identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind."

Also see *State v. Freber*, 366 So. 2d 426, 428 (Fla. 1978): "In our view, an identification made shortly after the crime is inherently more reliable than a later identification in court." Wigmore is even more direct: "Ordinarily, when a witness is asked to identify the [defendant], the witness' act of pointing out the accused *** then and there in the courtroom, is of little testimonial force. After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity." 4 J. Wigmore, Evidence § 1130, at 277 (Chadbourn rev. ed. 1972). Evidence of pretrial identification is even more important when the trial takes place long after the crime was committed. *United States v. Higgins*, 507 F.2d 808, 811 (7th Cir. 1974). Here, many months had elapsed between the time of the shooting and the time of trial.

The significant role that pretrial identifications play at trial requires that the trier of fact be told what safeguards against suggestiveness existed at the time of the pretrial identification. The number of lineups and photos viewed is clearly the most significant safeguard against suggestiveness.

Extensive research into this area has turned up only two state

court cases outside Illinois which directly address the issue of whether nonidentification testimony is admissible. In *Milholland v. State*, 319 Ark. 604, 608, 893 S.W.2d 327, 330 (1995), the Arkansas Supreme Court held that the fact that the witness had viewed over 200 mug shots and viewed several suspects and dismissed all of them before identifying the defendant was admissible and supported the reliability of the witness' identification.

In *People v. Bolden*, 58 N.Y.2d 741, 743, 445 N.E.2d 198, 200, 459 N.Y.S.2d 22, 23 (1982), Justice Gabrielli wrote in a concurring opinion: "[N]egative identification testimony is not hearsay. Such testimony by a third-party witness is not offered in evidence for the truth of the statement made by the declarant eyewitness. Rather, it is offered only to prove that the eyewitness possesses the ability to distinguish the particular features of the perpetrator of the crime. *** Furthermore, it may also be useful in demonstrating that the eyewitness was unwilling simply to select anyone offered to him by the police."

Similarly, in *United States v. Reliford*, 58 F.3d 247, 249 (6th Cir. 1995), the court upheld the admissibility of lineup instruction sheets and index cards on which the witnesses had written their identification of the defendant: "The exhibits were not hearsay; they were admitted for the purpose of showing that the lineup was not suggestive."

Further, witnesses may testify as to conversations which are part of the investigating procedure without violating the hearsay rule. *Jones*, 153 Ill. 2d at 159-60. In the case *sub judice*, our holding will require the State on retrial to confine its evidence on the subject of identification of the defendant to the date of the first identification—one year (or two) after the shooting. What is the jury to make of this delay? The defense will attack the investigation and the State will be precluded from explaining what investigatory steps were taken from the time of the shooting to the first lineup identification.

Evidence of which investigatory identification procedures were employed is especially relevant and should be admissible where those procedures are reliable. As Professor LaFave has said, "[a]s the number of photographs displayed decreases, the suggestivity increases." W. LaFave, Criminal Procedure § 7.4, at 589 (1984). As a corollary, as the number of photographs displayed increases, the suggestivity decreases. This is even more true when the photos viewed are of persons of the same race, age and have similar facial characteristics. None of the cases criticizing nonidentification testimony addresses this crucial factor. Indeed, none of the cases discuss whether the defendant's photo was in any of the mug books viewed by the witnesses. If there is no evidence that the defendant's photo was not in

the mug books viewed by the witness, the evidence does not actually "bolster" the identification.

Also, all identifications involve a form of negative identification evidence inasmuch as the selection by the eyewitnesses necessarily meant that the witness did not identify the other participants in the lineup or other photos in the mug book. When this court in *People v. Graham*, 179 Ill. App. 3d 496, 503 (1989), held that it was proper for a witness to testify that she viewed 300 mug shots before she identified a photo of the defendant, the witness was also saying that she did not identify the other 299 mug shots. Indeed, the holding in *Graham* provides a basis for the admission of nonidentification testimony if the questions and answers are phrased correctly.

Finally, the Supreme Court in *People v. Rogers*, 81 Ill. 2d 571, 578-79 (1980), cited Wigmore on evidence as support for admitting third-party testimony regarding pretrial identification. Wigmore commented: "This is a simple dictate of common sense and was never doubted in orthodox practice. That some modern courts are on record for rejecting such evidence is a telling illustration of the power of a technical rule of thumb to paralyze the judicial nerves of natural reasoning." 4 J. Wigmore, Evidence § 1130, at 279 (Chadbourn rev. ed. 1972). Illinois's rule barring nonidentification testimony is just such a technical rule that goes against all reason and logic and it should be discarded.